Evan J. Smith
BRODSKY & SMITH, LLC
240 Mineola Boulevard
First Floor
Mineola, NY 11501
Telephone:     516.741.4977
Facsimile:      516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEORGE SUSTENDAL, on behalf of himself and all others similarly situated,<br><br>               Plaintiff,<br><br>    vs.<br><br>GILAT SATELLITE NETWORKS LTD., DOV BAHARAV, ELYEZER SHKEDY, DAFNA COHEN, MEIR SHAMIR, DAFNA SHARIR, AMIR OFEK, ISHAY DAVIDI, AYLON RAFAELI, AMIRAM BOEHM, COMTECH TELECOMMUNICATIONS CORP., and CONVOY LTD.,<br><br>                  Defendants. | Case No.:<br><br><br>__CLASS ACTION__<br><br>CLASS ACTION COMPLAINT FOR:<br>(1)  Breach of Fiduciary Duties<br>(2)  Aiding and Abetting<br>(3)  Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(4)  Violation of § 20(a) of the Securities Exchange Act of 1934<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff George Sustendal ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

## SUMMARY OF THE ACTION

1.      Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of Gilat Satellite Networks Ltd. ("Gilat" or the "Company") against Gilat and Gilat's Board of Directors (the "Board" or the "Individual Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and for breaches of fiduciary duty, and aiding and abetting thereof, tied to the Individual Defendants' efforts to sell the Company to Comtech Telecommunications Corp. through its wholly-owned subsidiary Convoy Ltd. ("Merger Sub," and with Comtech Telecommunications Corp., "Comtech") as a result of an unfair process for an unfair price.  Plaintiff challenges and seeks to enjoin an upcoming stockholder vote on a proposed transaction by which Comtech will acquire each issued and outstanding share of Gilat for inadequate and insufficient consideration (the "Proposed Transaction" or "Merger").

2.      Pursuant to the terms of the definitive Agreement and Plan of Merger entered into by and among Gilat and Comtech on January 29, 2020 (the "Merger Agreement"), Comtech will acquire all of the outstanding shares of Gilat common stock, in compensation for which, Gilat stockholders will be entitled to receive only $7.18 per share and 0.08425 of a share of Comtech stock for every Gilat share they own.

3.      Thereafter, on March 2, 2020, Comtech filed a Registration Statement on form S-4 (the "S-4") with the SEC in support of the Proposed Transaction.

4.      The dubious nature of the Proposed Transaction is laid bare considering the sharp drop in price of Comtech common stock that has resulted since the announcement of the deal. Here, a portion of the Merger Consideration includes Comtech common stock exchanged at a *fixed* exchange ratio of 0.08425 which means that Gilat stockholders will receive 0.08425 shares of

2

Comtech common stock as a portion of the Merger Consideration in exchange for each of their Gilat shares, ***regardless of Comtech's stock price at the close of the transaction***. Thus, the consideration payable to Gilat's stockholders is not insulated from fluctuations in Comtech's stock price, and stockholders are left in the precarious position of not knowing whether the consideration payable to them will decline further.

5.     The failure of the Board to negotiate a collar to establish parameters to minimize the impact of stock price fluctuations on the value of the consideration payable to shareholders has proved extremely prejudicial to Gilat stockholders.  On January 28, 2020, the last trading day before the deal was announced, Comtech closed at $37.10 per share.  Since that time, Comtech has dropped sharply and closed on March 6, 2020 at $23.39 per share.  So, rather than the approximate $10.31 lauded to Gilat stockholders at the announcement of the deal, the Comtech stock drop has resulted in a merger consideration of approximately $9.15 per share.

6.     Such a sales process, or lack thereof, clearly indicates that the only end-goal acceptable to the Defendants was an acquisition of Gilat by Comtech.

7.     The Proposed Transaction is unfair and undervalued for a number of reasons. For example, in addition to Comtech's interest in the Proposed Transaction, the deal may also be tainted by conflicts of interest of the directors and Company executives.  Notably, certain of the Company's directors and senior executive officers may have been motivated to enter into the Proposed Transaction in order to receive benefits not shared equally with Plaintiff and members of the Class (defined below).  Under the terms of the Merger Agreement, all illiquid Company options and other incentive awards will vest no later than seven days before the effective date of the Proposed Transaction.

8.     Moreover, in approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell Gilat without first taking steps to ensure that Plaintiff and Class members (defined below) would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or Comtech without regard for Gilat public stockholders.  Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Gilat stockholders.

9.     In further violation of their fiduciary duties, Defendants caused to be filed the materially deficient S-4 on March 2, 2020 with SEC in an effort to solicit stockholders to vote their Gilat shares in favor of the Proposed Transaction.  The S-4 is materially deficient, deprives Gilat stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction, and is thus in breach of the Defendants fiduciary duties.  As detailed below, the S-4 omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for Gilat and Comtech, provided by Gilat and Comtech to the Company's financial advisor Jefferies LLC ("Jefferies") for use in its financial analyses; and (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, Jefferies.

10.     If the Proposed Transaction is approved, the Individual Defendants will have breached their fiduciary duties of loyalty and due care by, *inter alia*, agreeing to sell Gilat without first taking steps to ensure that Plaintiff and Class members (defined below), who are the minority stockholders of the Company, would obtain adequate and fair consideration under the circumstances.

4

11.    Absent judicial intervention, the Merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  Accordingly, this action seeks to enjoin the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to Gilat's stockholders, and to recover damages resulting from violations of federal securities laws by Defendants.

12.    Plaintiff alleges that he, along with all other public stockholders of Gilat common stock, are entitled to enjoin the Proposed Transaction or, alternatively, to recover damages in the event that the Proposed Transaction is consummated.

## THE PARTIES

13.    Plaintiff George Sustendal is and has been a stockholder of Gilat during all relevant times hereto.

14.    Defendant Gilat is an Israel corporation that maintains its principal place of business at Gilat House, Yegia Kapayim Street, Daniv Park, Kiryat Arye, Petah Tikva, Israel. Gilat provides satellite-based broadband communication solutions and services in Israel, Latin America, Asia, the Asia Pacific, North America, Africa, Europe, and CIS countries The Company was incorporated in 1987 and trades on the NYSE under the symbol "GILT."

15.    Defendant Dov Baharav ("Baharav") has served as a director of Gilat at all relevant times.  In addition, Baharav serves as the Chairman of the Board.

16.    Defendant Elyezer Shkedy ("Shkedy") has served as a director of Gilat at all relevant times.

17.    Defendant Dafna Cohen ("Cohen") has served as a director of Gilat at all relevant times.

18.     Defendant Meir Shamir ("Shamir") has served as a director of Gilat at all relevant times.

19.     Defendant Dafna Sharir ("Sharir") has served as a director of Gilat at all relevant times.

20.     Defendant Amir Ofek ("Ofek") has served as a director of Gilat at all relevant times.

21.     Defendant Ishay Davidi ("Davidi") has served as a director of Gilat at all relevant times.

22.     Defendant Aylon Rafaeli ("Rafaeli") has served as a director of Gilat at all relevant times.

23.     Defendant Amiram Boehm ("Boehm") has served as a director of Gilat at all relevant times.

24.     The Individual Defendants in paragraphs 15-23 are, and at all times relevant hereto have been, directors of Gilat.

25.     The Individual Defendants owe fiduciary duties including good faith, loyalty, due care and candor to Gilat's stockholders.

26.     The Individual Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship required them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's stockholders.

27.     Each Individual Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

28.     Defendant Comtech is a Delaware limited liability company, that designs, develops, produces, and markets products, systems, and services for communications solutions. Its executive office is located at 68 South Service Road, Suite 230 Melville, New York 11747. Comtech was incorporated in 1967 and trades on the NYSE under the symbol "CMTL."

29.     Defendant Merger Sub is a Delaware corporation and a wholly-owned subsidiary of Comtech.

## JURISDICTION AND VENUE

30.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

31.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

32.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District. Additionally, the Company's stock trades on the NYSE which is headquartered in this District.

## CLASS ACTION ALLEGATIONS

33.    Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of Gilat common stock who are being and will be harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

34.    This action is properly maintainable as a class action because:

a.    The Class is so numerous that joinder of all members is impracticable. Gilat's stock is publicly traded on the NYSE and, as of November 29, 2019, there were more than 24 million such shares outstanding.  The actual number of public stockholders of Gilat can be ascertained through discovery;

b.    There are questions of law and fact which are common to the Class, including *inter alia*, the following;

i.    Whether Defendants have violated the federal securities laws;

ii.    Whether Defendants made material misrepresentations and/or omitted material facts in the S-4; and

iii.    Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated;

c.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

8

d.    Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.    Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.    Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

35.    By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with Gilat's stockholders and owe the stockholders the duties of due care, loyalty, and good faith.

36.    By virtue of their positions as directors and/or officers of Gilat, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause Gilat to engage in the practices complained of herein.

37.    Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company's stockholders.  To diligently comply with these duties, directors of a corporation must:

a.  act with the requisite diligence and due care that is reasonable under the circumstances;

b.  act in the best interest of the Company's stockholders;

c.  use reasonable means to obtain material information relating to a given action or decision;

d.  refrain from acts involving conflicts of interest between the fulfillment of their roles in the Company and the fulfillment of any other roles or their personal affairs;

e.  avoid competing against the Company or exploiting any business opportunities of the Company for their own benefit, or the benefit of others; and

f.  disclose to the Company's stockholders all information and documents relating to the Company's affairs that they received by virtue of their positions in the Company.

38.  In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of Gilat, are obligated to refrain from:

a.  participating in any transaction where the directors' or officers' loyalties are divided;

b.  participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company's public stockholders; and/or

c.  unjustly enriching themselves at the expense or to the detriment of the stockholders.

10

39.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to Plaintiff and the other public stockholders of Gilat, including their duties of loyalty, good faith, and due care.

40.    As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their Gilat common stock in the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

### Gilat Background

41.    Gilat together with its subsidiaries, provides satellite-based broadband communication solutions and services in Israel, Latin America, Asia, the Asia Pacific, North America, Africa, Europe, and CIS countries. It operates through three segments: Fixed Networks, Mobility Solutions, and Terrestrial Infrastructure Projects. The company designs and manufactures ground-based satellite communications equipment; and provides solutions and end-to-end services. Its portfolio consists of very small aperture terminals, amplifiers, modems, on-the-move antennas, solid state amplifiers, block upconverters, low-profile antennas, and on-the-move/on-the-pause terminals. In addition, the company offers various solutions, including managed satellite network services, network planning and optimization, satellite capacity, remote network operation, call center support, hub and field operations, and communication networks construction and installation services. Further, it provides connectivity services, Internet access, and telephony services to enterprise, government, and residential customers; and builds telecommunication infrastructure using fiber-optic and wireless technologies for broadband connectivity. Gilat Satellite Networks Ltd. sells its products and solutions to communication service providers and

operators, mobile network operators, telecommunication companies, and system integrators, as well as to defense and homeland security organizations, and directly to end-users.

42.    Gilat was founded in 1987 and is headquartered in Petah Tikva, Israel. Gilat has 21 office locations across 19 countries and has modems in more than 500 networks globally.

43.    Gilat has continued to sustain strong financial performance.  For example, in its financial report for the 2Q 2019, the Company reported net income increased 58.3% to $3.4 million, compared with $2.2 million. In addition, the Company reported adjusted EBITDA increased 10.0% year over year to $8.9 million.

44.    Speaking on these positive results, Company CEO Yona Ovadia, referenced the Company's strategies and achievements, stating, "I am pleased to report that aside from Gilat's continued positive results and solid profitability in the second quarter, this has been a strong quarter as we executed our strategy to build high quality revenues through our growth engines of Broadband, Mobile Cellular Backhaul and Mobility IFC. We achieved two major milestones in the quarter that will be important drivers of our future growth. The first is in the area of Inflight Connectivity…  Second, we have reached a critical milestone in Peru with approval to enter the operational phase of the three-region telecom project awarded in 2015 by Fitel."

45.    The positive financial success and remarks by Company CEO are not an anomaly, as Gilat reported strong growth on their most recent Q3 financial highlights. In detail from the November 19, 2019 report, net income totaled $6.3 million, an 84.7% increase from $3.4 million, their total in Q2 2019. In addition, Adjusted EBITDA totaled $10.1 million, an increase of 10.6% year over year and 13.0% quarter over quarter.

46.    Speaking on these positive results, Company CEO Yona Ovadia commented, ""On the financial side we attained substantial progress as we continued to improve profitability. We

have attained a record achievement of double-digit millions of dollars of Adjusted EBITDA, $10.1 million to be exact. This has been achieved only once before since we made growth in profitability one of the pillars of our strategy, and we have every intention to repeat it going forward. On the business side, I am excited to report that Gilat reached a landmark achievement with the selection of Gilat's platform by SES for the O3b mPOWER Medium Earth Orbit (MEO) Communications System. Gilat was selected due to our innovative ground segment, that significantly reduces cost per bit, best-in-class spectral efficiency, and a step function in modem performance. This win positions Gilat at the forefront of ground networks for Non-Geo Stationary Orbit (NGSO) constellations and as well as a prominent player for the new generation of HTS and VHTS GEO satellites."

47.     Financial blog, Simply Wall St. posted an article on September 26, 2019 titled *Gilat Satellite Networks Ltd. (NASDAQ:GILT) Earns Among The Best Returns In Its Industry*. The article calculates Gilat's Return on Capital Employed ("ROCE") compared to the industry. ROCE is a measure of a company's yearly pre-tax profit, or its return, relative to the capital employed in the business. The article states, "Gilat Satellite Networks' ROCE is meaningfully higher than the 6.3% average in the Communications industry. We consider this a positive sign, because it suggests it uses capital more efficiently than similar companies."

48.     Despite this positive outlook and respect amongst the industry, the Proposed Transaction, and the valuation contained therein do not account for Gilat's continuous financial success.  If consummated, the Proposed Transaction would deprive Plaintiff and other members of the Class the true value of their investments.

*The Flawed Sales Process*

49.     As detailed in the S-4, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to Comtech.

50.     First, it appears that no market check was conducted by Company or its financial advisors during the sales process.

51.     Notably, the only reference to a market check that appears in the S-4 is in reference to one conducted in June 2018 – more than a full year prior to Gilat entering into exclusivity with Comtech in September 2019 to negotiate the Proposed Transaction.  The S-4 does not indicate why no timely market check was conducted during the sales process, or why exclusivity was entered into with Comtech without such a timely market check.

52.     In addition, while the S-4 indicates that both a "Transaction Committee" and a "Steering Committee" of Gilat board members was created to aid in different areas of the sales process, it gives no information regarding the specific powers and responsibilities of these committees, which had ultimate control over the sales process, and if either had veto powers over any potential transaction.  Moreover, neither of these Committees were composed entirely of independent Board members, which is especially concerning given that the decision by the Board to allow the Merger Agreement to be executed without a collar protecting the eventual merger consideration.

53.     The S-4 is also unclear as to the nature of any specific standstill restrictions arising out of the terms of any of the non-disclosure agreements entered into between Gilat on the one hand and any interested third party, including Comtech, on the other, and if the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in any such agreements, and if so, the specific conditions, if any, under which such provisions would fall away.

54.     Moreover, the S-4 is also unclear as to any differences that may exist between the various non-disclosure agreements entered into between Gilat and any interested third parties.

55.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

***The Proposed Transaction***

56.     On January 29, 2020, Gilat announced the Proposed Transaction.  The press release states in relevant part as follows:

> **MELVILLE, N.Y., & PETAH TIKVA, Israel**--(BUSINESS WIRE)--January 29, 2020 7:00 A.M. ET -- Comtech Telecommunications Corp. (Nasdaq: CMTL) ("Comtech") and Gilat Satellite Networks Ltd. (Nasdaq: GILT; TASE: GILT) ("Gilat") jointly announced today that Comtech has agreed to acquire Gilat in a cash and stock transaction for $10.25 per Gilat ordinary share of which 70% will be paid in cash and 30% in Comtech common stock, resulting in an enterprise value of approximately $532.5 million. Founded in 1987 with its headquarters in Israel, Gilat is a worldwide leader in satellite networking technology, solutions and services with market leading positions in the satellite ground station and in-flight connectivity solutions markets and deep expertise in operating large network infrastructures.
>
> Based on Comtech's fiscal year 2019 actual results and Gilat's trailing twelve-month results through June 30, 2019, on a pro-forma basis, Comtech would have reported approximately $926.1 million of revenue with Adjusted EBITDA of approximately $130.2 million (see definition and reconciliation to GAAP financial measures in the table below). The combined companies would employ approximately 3,000 people and offer best-in-class satellite technology, public safety and location technology and secure wireless solutions to commercial and government customers around the world.
>
> Fred Kornberg, Chairman of the Board and CEO of Comtech, said, "I am excited to have reached this agreement with Gilat and believe this combination is beneficial to the stakeholders of both companies. The acquisition better positions Comtech to take advantage of key marketplace trends, particularly the growing demand for satellite connectivity and the enormous long-term opportunity set that is emerging in the secure wireless communications market. I believe that the combination of accelerating satellite connectivity demand and the increasing availability of low-cost satellite bandwidth, makes this a perfect time to unify Comtech and Gilat's

15

solutions and offer our combined customers best-in-class platform-agnostic satellite ground station technologies. Gilat is an exceptional business that has developed extraordinary technology and has a well-respected product portfolio supported by strong research and development capabilities. I welcome Gilat's entire talented workforce to the Comtech family."

Dov Baharav, Chairman of the Board of Gilat, said, "The Gilat Board of Directors and management believe this highly strategic combination is compelling. It is an excellent outcome for our shareholders who receive both cash and an equity interest in a strong company with a broader range of products and the benefits of combined expertise and resources that is well positioned to create future value against a highly favorable industry backdrop. I have long admired Comtech's commitment to technology leadership and I firmly believe that employees will have expanded opportunities for career development. No doubt, the future will be very bright for Comtech and Gilat and all of our stakeholders."

**Key Strategic Benefits for Comtech Include**:

Drives global market access by creating a world leader with combined pro-forma sales approaching nearly $1.0 billion annually;

Strengthens Comtech's position as a leading supplier of advanced communication solutions, uniquely capable of servicing the expanding need for ground infrastructure to support both existing and emerging satellite networks;

Expands Comtech's product portfolio with highly complementary technologies, including Gilat's high-performance TDMA-based satellite modems and its next generation solid-state amplifiers;

Broadens leadership position in the rapidly growing in-flight connectivity and cellular backhaul markets which are expected to expand given the availability of lower-cost bandwidth and the adoption of satellite technologies into the 5G cellular backhaul ecosystem;

Bolsters world-class research and development capabilities, enabling Comtech to offer customers more complete end-to-end technology solutions;

Enhances ability to accelerate shareholder value creation by contributing to Comtech's ongoing strategy to move toward higher margin solutions and by increasing customer diversification geographically and by market; and

Potentially offers increased liquidity for existing and new Comtech shareholders, as Comtech plans to pursue a dual listing on the Nasdaq and Tel Aviv Stock Exchange ("TASE") to become effective upon the closing of the transaction. Acquisition Expected to be Cash Accretive and Have Minimal Integration Risks

Excluding the impact of acquisition plan costs (including transaction expenses) and with conservative anticipated synergies of only $2.0 million derived from the elimination of Gilat's public company costs, the acquisition of Gilat is expected to be cash accretive to Comtech during the first twelve months post-closing. Comtech believes that with careful planning and execution, it can capitalize on opportunities to achieve both sales growth and further efficiencies during the second-year post-closing.

Both companies' talented global workforces are expected to remain in place and focus intently on meeting all customer commitments and expectations, including supporting all existing products, services and agreements. The transaction enlarges Comtech's global market footprint with a significant physical presence in key international markets. This increased presence addresses a growing need for local touch points that can offer integrated secure connectivity solutions including public safety and location solutions. At the same time, Gilat will gain access to Comtech's strong relationships with the U.S. government, allowing expanded distribution of Gilat's products and solutions to the U.S. government. As such, Comtech believes the transaction carries minimal integration risk while creating numerous opportunities for potential long-term revenue and efficiency synergies going forward.

Comtech will continue to emphasize capturing growth opportunities from favorable market trends, including: expected increased demand for solutions to provide high speed in-flight satellite connectivity; the adoption of new satellite ground station technologies into the 5G cellular backhaul eco-system; and the expected need for equipment and network upgrades to accommodate an anticipated increase in satellite capacity when new Very High Throughput Satellites ("VHTS") and high capacity Medium Earth Orbit ("MEO") and Low Earth Orbit ("LEO") satellite constellations are launched and fully operational. Together with its previously announced pending acquisition of UHP Networks, Comtech believes it will be uniquely positioned to take advantage of these important trends.

Gilat announced on November 19, 2019 that it expects to achieve sales of between $260.0 million and $270.0 million with Adjusted EBITDA ranging from $38.0 million to $42.0 million for its fiscal year ended December 31, 2019. Comtech announced on December 4, 2019 that it expects to achieve sales of between $712.0 million and $732.0 million with Adjusted EBITDA ranging from $99.0 million to $103.0 million for its fiscal year ending July 31, 2020. Neither Comtech nor Gilat is revising their previously announced respective fiscal year financial outlook.

In light of the agreement between Comtech and Gilat, Gilat has cancelled its fourth quarter and fiscal 2019 year-end conference call and webcast previously scheduled for February 19, 2020. Once the transaction closes, Comtech will provide combined revenue, Adjusted EBITDA and diluted earnings per share guidance in a future announcement.

**Leadership and Business Structure**

Fred Kornberg, Comtech's Chairman of the Board and Chief Executive Officer ("CEO") will continue in his role as CEO of the combined company. Michael Porcelain, Comtech's Chief Operating Officer, who was promoted and named President of Comtech earlier today, will work hand-in-hand with both Comtech and Gilat employees to maximize the potential of the combined company. Michael Bondi will continue in his role as Chief Financial Officer ("CFO") of the combined company. Comtech will continue to maintain its headquarters in Melville, New York.

Post-closing of the transaction, Gilat will become a wholly owned subsidiary of Comtech and will maintain its well renowned and highly regarded brand. Gilat will continue to maintain its corporate headquarters and research and development facility in Petah Tikva, Israel under the leadership of Yona Ovadia, Gilat's CEO and Adi Sfadia, Gilat's CFO. Mr. Sfadia will also be assuming the role of Gilat's Chief Integration Officer, helping to plan a smooth acquisition and to maximize shareholder value.

No Comtech or Gilat facility locations are expected to be closed as a result of the transaction and each key business area is expected to continue to be led by its respective existing proven leadership teams after the transaction closes.
Transaction Structure and Terms

Under the terms of the agreement, unanimously approved by both companies' Board of Directors, Gilat shareholders will receive total consideration of $10.25 per share, comprised of $7.18 per share in cash and 0.08425 of a share of Comtech common stock for each share of Gilat held.

The total consideration of $10.25 represents a premium of approximately 14.52% to Gilat's 90-day volume-weighted average trading price. Upon completion of the transaction, Gilat's shareholders will own approximately 16.1% of the combined company.

**Financing and Acquisition Plan Expenses**

As of September 30, 2019, Gilat had approximately $53.1 million of unrestricted cash and cash equivalents with debt of approximately $8.2 million. As of October 31, 2019, Comtech had approximately $46.9 million of cash and cash equivalents and debt of approximately $169.0 million.

Comtech expects to fund the acquisition and related transaction costs by redeploying a portion of the $100.0 million of pro forma combined cash and cash equivalents plus additional cash expected to be generated prior to closing, and by

drawing on a new $800.0 million secured credit facility to be provided by Citibank, N.A., Manufacturers and Traders Trust Company ("M&T Bank"), Santander Bank, N.A., BMO Harris Bank, N.A. ("Bank of Montreal"), Regions Bank, Israel Discount Bank of New York and Goldman Sachs Bank USA. Comtech expects that the cash interest rate on this facility will approximate 4.0% to 5.0% on an annual basis, before any origination fees. Furthermore, Comtech expects the terms of the facility will be based on a net leverage ratio providing significant flexibility. The exact terms of the credit facility will be finalized at or prior to the closing of the acquisition.

On a pro forma basis including preliminary estimated combined acquisition plan expenses of approximately $27.0 million, the repayment of Gilat bank debt and funding of Comtech's other pending acquisitions, Comtech would have approximately $45.0 million of unrestricted cash at closing with total net debt of approximately $500.0 million or net leverage of 3.85x. Total net debt is expected to decrease quickly and significantly. Based on expected strong cash flows to be generated from the combined businesses, net leverage twelve months after closing will decrease to approximately 3.00x.

Comtech expects that it will maintain its annual targeted dividend of $0.40 per share.

In connection with the acquisition of Gilat, Comtech expects to incur acquisition plan expenses (including professional fees for financial and legal advisors and debt refinancing costs). Some of these expenses are expected to be immediately expensed both prior to and upon closing, another portion expensed during the first year following the closing and the balance capitalized. Pursuant to accounting rules, the acquisition is expected to result in a material increase in annual amortization expense related to intangibles and other fair value adjustments.

**Shareholder Support and Closing Conditions**

Gilat's directors, executive officers and certain significant shareholders holding approximately 45% of Gilat's issued and outstanding shares in the aggregate have entered into voting agreements pursuant to which they have agreed, subject to certain terms and conditions, to vote in favor of the transaction. In the upcoming weeks, Gilat will call for an Extraordinary General meeting of Shareholders to vote on the merger. The transaction requires the affirmative vote of the holders of a majority of the ordinary shares present (in person or by proxy) at the meeting and voting on such matter (including abstentions and broker non-votes).

The transaction is subject to customary closing conditions (including, among others, the approval of Gilat's shareholders and expiration of the applicable waiting period under the Hart-Scott Rodino Antitrust Improvements Act of 1976) and the transaction is expected to close late in Comtech's fiscal year 2020 or the first part

of its fiscal 2021. No approval by Comtech stockholders is required and the consummation of the transaction is not subject to any financing condition.

***The Inadequate Merger Consideration***

57.     The Company's industry presence and potential for future growth establish the inadequacy of the merger consideration.

58.     Pursuant to the terms of the Merger Agreement, the Proposed Transaction values shares of Gilat at $7.18 in cash, without interest, plus 0.08425 of Comtech shares per Gilat Share.

59.     The communications community has noted Gilat's various benefits to Comtech. In a January 29, 2020 <u>Via Satellite</u> article reporting the Proposed Transaction, the author stated, "specifically, acquiring Gilat gives Comtech a leading position in the IFC market, citing Gilat's end-to-end solutions and its relationships with customers such as Go-Go, Honeywell, and Global Eagle. Further, Gilat allows Comtech to meet the needs backhaul needs of mobile operators who are adopting Low-Earth Orbit (LEO) and Medium-Earth Orbit (MEO) technologies…Comtech's intent to leverage Gilat's success and achievement over the past several years in the satellite communication industry, including leadership position in the in-flight connectivity and cellular backhaul."

60.     A main focus for Comtech's purchase of Gilat was its long-established features. As Comtech CEO Fred Kornberg said in the January 29, 2020 press release detailing the Proposed Transaction, "Gilat has 'developed extraordinary technology and has a well-respected product portfolio supported by strong research and development capabilities." Comtech needed Gilat's international presence and technology to be able to become the new "Dominant" Cellular Backhaul Entity, as proclaimed by <u>Via Satellite</u>, which they achieved by paying no premium on its purchase price for Gilat.

61.     Gilat's has numerous partners across the globe and recently partnered with China Satellite Communications Co., Ltd., a state-owned communications enterprise in China, to jointly provide advanced satellite communication services covering: Aero, Land and Maritime fixed and mobility applications, as said by an October 29, 2019 Gilat press release. A strategic partnership with China and many other international forces, demands a higher premium from Comtech in itself.

62.     Notably, the stock consideration payable to Gilat shareholders is not insulated from fluctuations in Comtech's stock price. If Comtech's stock price were to drop, shareholders will not be compensated adequately for their ownership in Gilat stock. Since that time, Comtech has dropped sharply and closed on March 6, 2020 at $23.39 per share.  So, rather than the approximate $10.31 lauded to Gilat stockholders at the announcement of the deal, the Comtech stock drop has resulted in a merger consideration of approximately $9.15 per share, a decrease in value of more than 10%.

63.     Accordingly, the Proposed Transaction will allow Comtech to purchase Gilat at an unfairly low price while availing itself of Gilat's significant value and upside or long-term potential.

***Potential Conflicts of Interest***

64.     The substantial interests of the Individual Defendants and other Company insiders themselves cannot be ignored.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for significant amounts of money upon the consummation of the Proposed Transaction.  Notably the S-4 does not include a specific listing of stock owned by Company insiders, nor the compensation expected to

be afforded to them under the terms of the Proposed Transaction, leaving Plaintiff and other Class members in the dark on this issue.

65.     In addition, pursuant to the Merger Agreement, as a consequence of the Merger, each outstanding and unvested Company option and/or restricted stock will automatically vest and/or be converted into the right to receive cash or stock in certain amounts.  As a result, the Individual Defendants will receive immediate lump sum cash payments in exchange for their (collective) thousands of currently illiquid Gilat options and restricted stock.   While the S-4 indicates that, "As of February 25, 2020, the directors and executive officers of Gilat (16 individuals) hold an aggregate of options to purchase 2,093,897 Gilat Shares," the S-4 fails to break down the specific ownership by Company Directors and insiders, nor the compensation expected to be afforded to them under the terms of the Proposed Transaction, leaving Plaintiff and other Class members in the dark on this issue.

66.     Moreover, certain employment agreements with certain Gilat executives, entitle such executives to their annual bonuses should their employment be terminated due to a change-in-control.  Notably, these benefits were agreed upon and secured *during the negotiations of the merger agreement*, clearly indicating that the personal compensation of Company insiders was of higher importance than obtaining fair value for Gilat stock.

67.     Based on the above, the Proposed Transaction is the product of an unfair and inadequate sales process conducted by the Board and Company insiders with an eye to personal compensation and in breach of its fiduciary duties and which fails to maximizer stockholder value.

***Preclusive Deal Mechanisms***

68.     The Merger Agreement contains certain provisions that unfairly favor Comtech by making an alternative transaction either prohibitively expensive or otherwise impossible.  For

example, the Merger Agreement contains a termination fee provision that requires Gilat to pay up to $21,675,000.00 to Comtech if the Merger Agreement is terminated under certain circumstances. Under one such circumstance, Gilat must pay the termination fee to Comtech should it enter into any acquisition proposal up to *twelve (12) months* after the Proposed Transaction is terminated.

69.     The termination fee payable under this provision will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to Gilat stockholders.

70.     Additionally, the Merger Agreement also contains a "No Solicitation" provision that restricts Gilat from considering alternative acquisition proposals by, *inter alia*, constraining Gilat's ability to solicit or communicate with potential acquirers.

71.     Moreover, the Merger Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Defendants agreed to provide the Gilat information in order to match any other offer, thus providing the Comtech access to the unsolicited bidder's financial information and giving the Comtech the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of the Comtech.

72.     Finally, as noted in the press release announcing the Proposed Transaction, holders of approximately 45% of the outstanding stock of Gilat have already signed a voting and support agreement, agreeing to vote their stock in favor of the Proposed Transaction, making its consummation all but certain.

73.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction, and the Proposed Transaction is the product of the Board's breaches of fiduciary duty.

*The Materially Misleading and/or Incomplete S-4*

74.     On March 2, 2020, the Defendants caused to be filed with the SEC a materially misleading and incomplete S-4 that, in violation their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

75.     The S-4 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction.  In particular, the S-4 fails to disclose:

> a.   The nature of any specific standstill restrictions arising out of the terms of any of the non-disclosure agreements entered into between Gilat on the one hand and any interested third party, including Comtech, on the other, and if the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in any such agreements, and if so, the specific conditions, if any, under which such provisions would fall away;
>
> b.   The nature of any differences that exist between the various non-disclosure agreements entered into between Gilat and any interested third parties;
>
> c.   The reasoning as to why no market check was conducted during the sales process other than the one carried out in June of 2018, more than one year before Gilat entered into exclusivity with Comtech;

d.  The specific powers and responsibilities of the transaction committee of the Gilat Board in relation to the sales process;

e.  The specific powers and responsibilities of the steering committee of the Gilat Board in relation to the sales process;

f.  The reasoning as to why non-independent Board members were allowed to sit on either of the transaction and/or steering committees;

g.  The specific reasoning as to why the Gilat Board agreed to forego any collar based upon the stock price of Comtech at a point in time before the Merger Agreement had been entered into;

h.  The terms of the engagements of certain of Gilat's financial advisors, specifically, Alnitak & Co. Inc. ("Alnitak") and Quilty Analytics LLC ("Quilty"), including: (i) the amount of compensation each of Alnitak and Quilty has already received or will receive in connection with its engagement; (ii) any amount contingent on consummation of the Proposed Transaction; (iii) past services for any parties to the Merger Agreement and the compensation paid for providing such services; and

i.  Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

*Omissions and/or Material Misrepresentations Concerning Gilat's Financial Projections*

76.    The S-4 fails to provide material information concerning financial projections provided by Gilat's management and relied upon by Jefferies' in its analyses.  The S-4 discloses management-prepared financial projections for the Company which are materially misleading. The S-4 indicates that in connection with the rendering of Jefferies' fairness opinions, Jefferies reviewed "certain financial forecasts and estimates relating to Gilat provided to or discussed with Jefferies by the management of Gilat under a "base case" and an "upside case" and discussed with the management of Gilat its assessments as to the relative likelihood of achieving the future financial results reflected in such cases."  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig*., 924 A.2d 171, 201-203 (Del. Ch. 2007).

77.    With respect to Gilat's financial projections, the S-4 fails to disclose, for each set of projections: (i) all line items used to calculate (a) Adjusted EBITDA and (b) Unlevered Free Cash Flow; and (ii) a reconciliation of all non-GAAP to GAAP metrics.

78.    This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

79.    Without accurate projection data presented in the S-4, Plaintiff and other stockholders of Gilat are unable to properly evaluate the Company's true worth, the accuracy of Jefferies' financial analyses, or make an informed decision whether to vote their Company stock

in favor of the Proposed Transaction. As such, the Board has breached their fiduciary duties by failing to include such information in the S-4.

*Omissions and/or Material Misrepresentations Concerning Comtech's Financial Projections*

80. The S-4 fails to provide material information concerning financial projections provided by Comtech management and relied upon by Jefferies in its analyses. The S-4 indicates that in connection with the rendering of Jefferies' fairness opinion Jefferies "reviewed certain financial forecasts and estimates relating to Comtech provided to or discussed with Jefferies by the management of Comtech." Accordingly, the S-4 should have, but fails to provide, certain information in the projections that Comtech management provided to Jefferies. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

81. Notably despite Comtech stock being part of the compensation offered to Plaintiff and other Gilat stockholders under the terms of the Proposed Transaction, the S-4 does not provide any projection data whatsoever regarding Comtech. This completely negates any attempt for Plaintiff or other Gilat stockholders to gauge the true value of the merger consideration being offer, and as such, also negates any ability for Plaintiff or other Gilat stockholders to make an informed decision regarding whether to vote for the Proposed Transaction.

82. This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness. Without this information, stockholders were

not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

83.     Without accurate projection data presented in the S-4, Plaintiff and other stockholders of Gilat are unable to properly evaluate the Company's true worth, the accuracy of Jefferies' financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the S-4.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Jefferies*

84.     In the S-4, Jefferies describes its respective fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

85.     With respect to the *Selected Comparable Companies Analysis - Gilat*, the S-4 fails to disclose the following:

      a.  Why only three companies were chosen to compare, one of which was Comtech; and

      b.  The specific benchmark multiples for each Comparable Company

86.     With respect to the *Selected Precedent Transactions Analysis - Gilat*, the S-4 fails to disclose the following:

      a.  The total value of each selected transaction;

      b.  The specific date on which each selected transaction closed; and

c.   The specific benchmark multiples for each transaction.

87.    With respect to the *Discounted Cash Flow Analysis - Gilat*, the S-4 fails to disclose the following:

a.   The specific inputs and assumptions used to calculate the perpetuity growth rates of 1.5% to 2.5%;

b.   The specific inputs and assumptions used to calculate the discount rate range of 8.0% to 9.0%;

c.   the stand-alone unlevered, after-tax free cash flows forecasted during the fiscal years ending December 31, 2020 - December 31, 2024 and all underlying line items;

d.   projected net operating loss carryforwards; and

e.   the Company's terminal values.

88.    With respect to the *Selected Comparable Companies Analysis - Comtech*, the S-4 fails to disclose the specific benchmark multiples for each Comparable Company

89.    These disclosures are critical for stockholders to be able to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

90.    Without the omitted information identified above, Gilat's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests.   Moreover, without the key financial information and related disclosures, Gilat's public stockholders cannot gauge the reliability of the fairness opinion and the Board's determination that the Proposed Transaction is in their best interests.   As such, the Board has breached their fiduciary duties by failing to include such information in the S-4.

29

## FIRST COUNT

### Breach of Fiduciary Duty
### <u>Against the Individual Defendants</u>

91.      Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

92.      As alleged herein, Defendants have initiated a process to sell Gilat in a transaction

that undervalues the Company.  The Individual Defendants are privy to non-public information

concerning the Company that the public stock stockholders are not; thus, there exists a fiduciary

duty to protect these stockholders.  Defendants have failed to sufficiently inform themselves of

Gilat's value, or have disregarded the true value of the Company.  Furthermore, the Individual

Defendants have agreed to onerous deal protection devices that discourage any alternate acquirer

from coming forward in the face of the knowledge that Comtech can block the purchase.

93.      As such, unless the Individual Defendants' conduct is enjoined by the Court, they

will continue to breach their fiduciary duties to Plaintiff and the other members of the Class, and

will further a process that inhibits the maximization of stockholder value and the disclosure of

material information.

94.      Plaintiff and the members of the Class have no adequate remedy at law

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty
### Against Defendants Gilat Satellite Networks Ltd.,
### <u>Comtech Telecommunications Corp., and Convoy Ltd</u>

95.      Plaintiff incorporates each and every allegation set forth above as if fully set forth

herein.

96.     Defendants Gilat, Comtech, and Merger Sub, knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Acquisition, which, without such aid, would not have occurred.

97.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

98.     Plaintiff and the members of the Class have no adequate remedy at law

### THIRD COUNT

### Violations of Section 14(a) of the Exchange Act
### Against All Defendants

99.     Plaintiff repeats all previous allegations as if set forth in full herein.

100.    Defendants have disseminated the S-4 with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

101.    Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

102.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or

necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

103.    The S-4 was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the S-4 is materially misleading and omits material facts that are necessary to render them non-misleading.

104.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

105.    The Individual Defendants were at least negligent in filing an S-4 that was materially misleading and/or omitted material facts necessary to make the S-4 not misleading.

106.    The misrepresentations and omissions in the S-4 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to vote their shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

**FOURTH COUNT**

**Violations of Section 20(a) of the Exchange Act**
**Against The Individual Defendants**

107.    Plaintiff repeats all previous allegations as if set forth in full herein.

108.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and

Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the S-4 was materially misleading to Company stockholders.

109.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the S-4 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the S-4.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the S-4 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

110.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of Gilat's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the S-4 was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the S-4 and are therefore responsible and liable for the misrepresentations contained herein.

111.    The Individual Defendants acted as controlling persons of Gilat within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause Gilat to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled Gilat and all of its employees.  As

alleged above, Gilat is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as Class counsel;

B.    Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction on the terms presently contemplated;

C.    To the extent the Proposed Transaction is consummated before entry of this Court's judgment, rescinding it and setting it aside or awarding rescissory damages;

D.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

E.    Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: March 10, 2020

**BRODSKY & SMITH, LLC**

Evan J. Smith
240 Mineola Boulevard
First Floor
Mineola, NY 11501

Telephone:     516.741.4977
Facsimile:     516.741.0626
esmith@brodskysmith.com

*Attorneys for Plaintiff*